1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney

2

3   HALLIE HOFFMAN (CABN 210020)
    Chief, Criminal Division

4   KEVIN J. BARRY (CABN 229748)
    PHILIP KOPCZYNSKI (NYBN 4627741)

5   Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495

7       Telephone: (415) 436-7200
        Fax: (415) 436-7234

8       kevin.barry@usdoj.gov
        philip.kopczynski@usdoj.gov

9

10  Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14

15  UNITED STATES OF AMERICA,          )   CASE NO. CR 13-0764 WHO
                                       )
        Plaintiff,                     )   **UNITED STATES' SENTENCING**
16                                     )   **MEMORANDUM**
        v.                             )
17                                     )   Sentencing Date: October 4, 2019
    REGINALD ELMORE, et al.,           )   Time:            1:30 pm
18                                     )
        Defendants.                    )   Hon. William H. Orrick
19                                     )
                                       )
20  _____ )

21

22

23

24

25

26

27

28

**INTRODUCTION**

Defendant Reginald Elmore stands before the Court to be sentenced following his guilty pleas in open court to Counts One and Eight of the Superseding Indictment, alleging RICO conspiracy and the use of a firearm in murder.  Dkt. 2110.  Defendant's total offense level is 43, which, when combined with his criminal history category of VI, leads to an advisory guideline of life in prison.

In addition to brutally murdering its rivals, the CDP racketeering enterprise also committed numerous shootings and armed robberies, repeatedly prostituted young girls, and engaged in narcotics trafficking, among other criminal acts.  For his part of the conspiracy, Elmore participated in the double murder of Isiah Turner and Andre Helton, taunted CDP rivals, committed robberies with CDP members, and opened fire on people attending the funeral of a young man who had been murdered, among other criminal conduct.

Given the defendant's persistent criminality, his demonstrated danger to the community, and the need to impose just punishment, the government respectfully requests that the Court impose a custodial sentence of 420 months in prison to be followed by five years of supervised release, an expanded search condition, and a mandatory special assessment of $200.

**THE OFFENSE CONDUCT**

**I.    The CDP Enterprise**

From November 2017 through March 2018, the Court conducted a trial for the defendants in Group One—Charles Heard, Jaquain Young, Adrian Gordon, Esau Ferdinand, and Monzell Harding. The jury convicted each of these defendants of their participation in the CDP RICO enterprise, and it specifically found beyond a reasonable doubt that each of the CDP members in Group One knowingly and intentionally agreed that the pattern of racketeering activity in which CDP engaged would include murder.  Dkt. 1765 at 2 (Verdict Form).  When Defendant Elmore pleaded guilty to Count Eight, he agreed that murder was part of CDP as well.

Count Eight, the murder count, involved the double homicide of Isaiah Turner and Andre Helton near the University of San Francisco campus on August 14, 2008.  In pleading guilty to using a firearm in connection with that murder, Elmore admitted guilt through *Pinkerton* liability.  That is, he admitted that he was guilty because (a) he was a member of a RICO enterprise—CDP; (b) a member of

U.S. SENTENCING MEMORANDUM
CR 13-00764 WHO                                                              1

1  CDP committed the double murder; and (c) the murder was within the scope of the enterprise and it was

2  reasonably foreseeable to Elmore that someone in CDP would commit such a murder.

3       As the jury for Group One heard, CDP was responsible for a significant number of homicides—

4  the double murder of Isaiah Turner and Andre Helton; the murder of Richard Barrett; the murder of

5  Jelvon Helton; the murder of Donte Levexier; and the murder of Calvin Sneed.

6       The jury also heard extensive and wrenching testimony regarding CDP members' pimping of

7  underage girls and young women.  Further, a number of victims of armed robberies at the hands of CDP

8  members gave their accounts of what happened to them, and in many cases, the trauma is still present,

9  particularly for those victims who were convinced they were about to die.

10  **II.      Elmore's Role Within the CDP Enterprise**

11       Defendant Elmore was an active and eager participant in CDP.  He had some status, in that he

12  was willing to shoot at people, but he did not have the same respect enjoyed by others in CDP.  Charles

13  Heard and Julius Hughes were "consistent shooters" and were respected by everyone in the gang, and

14  Alfonzo Williams had money and a leadership role in the enterprise.  RT 4424-30 (JB).  "Reg was a

15  shooter, but not as much as Heard.  Reg didn't have as much respect as Cheese did.  Cheese was very

16  respected."  For Heard, his reputation even transcended CDP.

17      [Charles Heard] was a shooter, like I expressed.  Other people outside of my gang would
        respect him because he's consistently shooting at them, and other people in the San

18      Francisco area, other areas of San Francisco, would respect him due to he's consistently

19      shooting at other people.  So he had respect among other gangs in the city.

20  RT 4441-42 (JB).  One of the ways to gain more status within CDP was to participate in the murder of

21  rival gang members.

22      Q.  Were shooters given more respect within CDP?

23      A.  Yes.
        Q.  And you just described the – sorry.  Were you finished with your answer?

24      A.  If you're consistent.  That's what I'm trying to express to you.  Julius, Cheese, they

25      was consistent shooters, so it wasn't just like I'll shoot somebody one time.  It was
        consistently.  So it was ongoing, and that's how you get more respect.

26

27  RT 4428 (JB).

28      Q.  Was there any way that you could get more respect within the group, you personally?

A. Shooting.  Killing somebody.

Q. If you killed somebody, that would get you more respect?

A. Not anybody.  Killing a rival gang member, somebody that we don't get along with [such] as Eddy Rock OC.

RT 4438 (JB).

Although Defendant Elmore was not considered one of the leaders or most respected members of CDP, he nevertheless had more status that younger members, as shown by his ability to tell them what to do.

> We – once we tried to get away, Reginald Elmore, he – he gave me the firearm that was used in the shooting, and he had a record at the time, so he gave me the firearm, and he told me to take the case.  Basically what I'm trying to express is some of the members, they already have records so they have firearm cases, robbery cases, and basically if you don't have a record within a gang, you would be – you would be told or you would have to take the case.

RT 4465 (JB).  Elmore also was instrumental in teaching younger members how to commit crimes such as robberies.

> A. Just get up on your target, always whip out the gun first and always pat them down. Pat your target down after – during the robbery or after the fact.
> Q. Did they [Heard and Elmore] say anything about taking specific items?
> A. Chains.  Well, jewelry.
> Q. What about phones?  Did they say anything about phones?
> A. Basically they – that's the part – once you search them, once you rob your victim, you search them, take his phone or ID or whatever he has.  That way he's not able to call the police.

RT 4605 (JB).

**III.    Specific Crimes By Elmore on Behalf of CDP**

**A.        The August 14, 2008 Double Murder of Isiah Turner and Andre Helton**

The first and most brutal of the CDP crimes for which Defendant Elmore is directly responsible is the August 14, 2008 double murder of Isiah Turner and Andre Helton.  That homicide not only was a terrible crime in itself, but it sparked a violent war between the former Uptown allies CDP and Knock Out Posse, or KOP.  Andre Helton, whose street name was Baby Bin, was member of KOP.  His murder at the hands of CDP members Elmore and Heard led to a vicious cycle of violence and reprisals, including the murders of Julius Hughes, Jelvon Helton, and Donte Levexier, as well as the attempted

U.S. SENTENCING MEMORANDUM
CR 13-00764 WHO                                       3

murder of Patrick McCree.  The facts supporting Elmore's role in that offense are presented in the

government's initial sentencing memorandum, and will not be repeated here.  *See* Dkt. 2153.  However,

it is important to note some aspects of the proof with regard to those facts.  The first is the fact that

Elmore bragged about the killing.

> Q.  And did you have an opportunity to observe Mr. Elmore's demeanor when he was talking about this incident?
> A.  Yes.
> Q.  What was it like?
> A.  He bragged.  He laughed.  Bragged.  He made attempts – I mean, he made subliminals.

RT 4733 (JB).

> Q.  You testified previously about conversations you had with Reginald Elmore about the double murder.
> A.  Yes.
> Q.  Do you recall testifying that he was bragging?
> A.  Yes.
> Q.  Was it more than one conversation you had with Mr. Elmore about this?
> A.  Yes.
> Q.  Who was there when he was bragging about this?
> A.  Other CDP members and Chopper City members.
> Q.  Who specifically was there while Mr. Elmore was bragging about this that you remember?
> A.  Cheese, Sauce, Gigs, myself, Samar.
> Q.  When Reginald Elmore was bragging about having killed these two people, did Charles Heard ever say anything?
> A.  He was present, but, no.
> Q.  Did he ever jump up and say, No, that's not what happened?
> A.  No.
> Q.  So Mr. Elmore was bragging about having two bodies; is that fair to say?
> A.  Yes.
> Q.  And you testified previously that having bodies equals respect in CDP?
> A.  Yes.
> Q.  And the same is true of having money?
> A.  Yes.
> Q.  So members of CDP who have more bodies and more money get more respect?
> A.  Yes.

RT 5613-14 (JB). This is significant because Elmore's motive in committing this homicide was not spur-of-the-moment rage, financial desperation, or revenge. Instead, it was for the purpose of gaining respect within the CDP criminal enterprise.

Elmore's bragging is also consistent with the motive of addressing disrespect he felt because of Andre Helton's intervention to recover City Shine's property following the first robbery.

> Q. How did Reg feel about Baby Bin calling him and asking him to give back the chain to City – Shine or Sean?
> A. Shine.
> Q. City Shine?
> A. Yes.
> Q. Shine?
> A. I don't know.
> Q. Something like that. How did Mr. Elmore feel about Baby Bin making these phone calls?
> A. He felt angry and he felt disrespected.

RT 4782-83 (JB).

### B. The January 8, 2009 Funeral Shooting

A second significant crime that Elmore committed on behalf of CDP was the attempted murder of individuals who were attending the funeral of a murdered Eddy Rock / OC member on January 8, 2009. Defendant Elmore pleaded guilty to being a felon in possession of a firearm in connection with that incident, PSR ¶ 84, but the evidence at the Group One trial demonstrated that his actions were far more serious. The January 8, 2009 funeral was for Lazarus Pickett, someone associated with Eddy Rock, CDP's Downtown rival. PSR ¶ 84; RT 2681; 2869-70 (Griffin); RT 4513, 4405-06, 4422, 4442, 4447-48, 4487, 4513 (JB). Elmore told JB that he shot up the funeral because CDP member Greg Walker—one of the participants in the Turk Street shootout—was directed to attend by his father, who was dating Lazarus Pickett's mother. RT 4513 (JB). At the funeral, Walker was assaulted by Eddy Rock members. RT 4513 (JB). In response, Elmore and other CDP members came to the funeral and stood across the street. Ex. 389 (video of funeral shooting). Elmore began taunting the people attending the funeral, and then he opened fire on them with a Tec-9 firearm. Ex. 389; Ex. 358 (firearm). This so

1  outraged the victims that they began streaming across the street—and toward the source of the gunfire—

2  and assaulted those involved as police were attempting to take them into custody.  Ex. 389.

3        **C.      Other Criminal Conduct**

4        In addition to these two incidents, the evidence at trial showed a host of other crimes in which

5  Defendant Elmore participated with other CDP members.  These include at least four instances in which

6  Elmore was either found in possession of a firearm or ran from police while carrying a loaded gun.  PSR

7  ¶¶ 49(g), (h), (j), and (o).  JB also recounted multiple instances during which he participated in armed

8  robberies with Elmore and other CDP members.  These included the armed robbery of a person in 2008

9  at the Serramonte Mall.  RT 5237-40 (JB).  Also present during that robbery were CDP members

10  Charles Heard, Greg Walker, Esau Ferdinand, and Fred Maye.  RT 5237-40.  JB also recounted a 2008

11  armed robbery of a person in Chopper City territory with Elmore and Ferdinand in which they robbed

12  the victim of his earrings and car keys.  RT at 5240-42.  During that robbery, Elmore not only held the

13  gun; he also slapped the victim a few times.

14        Another significant incident involving Elmore and other CDP members took place in Chopper

15  City territory shortly after the August 2008 double murder.  In that incident, Elmore and other CDP

16  members began taunting a girl they knew was associated with KOP.  RT 4721-24 (JB).  In response,

17  three KOP members arrived and began shooting, and Charles Heard returned fire.  Police later recovered

18  39 shell casings from three different caliber firearms.  RT 7387-88 (Jackson).

19                       **SENTENCING GUIDELINES CALCULATION**

20        The Presentence Report accurately concludes that the base offense level for Count One—RICO

21  Conspiracy—is 43 through a cross reference to the Guideline for murder.  As discussed above,

22  Defendant Elmore admitted that he was a CDP member and that it was reasonably foreseeable that a

23  CDP member could commit murder, such as the double murder of Isiah Turner and Andre Helton.  The

24  same offense level applies to Count Eight, the use of a firearm during that VICAR murder.  Because the

25  two counts do not group, an enhancement of 2 levels is applied through Section 3D1.4, for an offense

26  level of 45.  With a deduction of 2 levels for acceptance of responsibility through a guilty plea, that

27  results in an adjusted offense level of 43.

28

1    The PSR correctly calculated Elmore's criminal history category as VI, due to his five prior

2    felony convictions, his misdemeanor conviction, and his commission of the offenses at issue while

3    serving a term of court supervision.

4    An adjusted offense level of 43 and a CHC VI yields a Guidelines range of life imprisonment.

5                                    **SECTION 3553(A) FACTORS**

6    Section 3553(a) directs the district court to consider a number of factors in determining an

7    appropriate sentence.  In this case, these factors indicate that a sentence of 420 months in custody is

8    sufficient, but not greater than necessary, to achieve the goals of sentencing.  *See United States v. Carty*,

9    520 F.3d 984, 991 (9th Cir. 2008).  The key factors are the nature and circumstances of the offense and

10   the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), the need to afford adequate

11   deterrence to criminal conduct, 3553(a)(2)(B), the need to protect the public from further crimes of the

12   defendant, 3553(a)(2)(C), the need to impose just punishment, 3553(a)(2)(A), and the need to avoid

13   unwarranted sentencing disparities among defendants with similar records who have been found guilty

14   of similar conduct, 3553(a)(6).

15   With respect to the nature and circumstances of the offense, the Court heard ample evidence

16   about the brutality of the murders of Isiah Turner and Andre Helton.  The act was premeditated, with

17   considerable planning.  Compounding the heinous nature of the crime is the fact that Elmore bragged

18   and laughed about it.  RT 4733.  He even joked that Andre Helton's last "words" were a moan.

19   Q.  Did he ever say anything to you about what Baby Bin's last words were?
     A.  Yes.
20   Q.  What did he tell you about that?
     A.  He said that when Baby Bin got killed, murdered, that he – he made a moaning sound
21      when he was getting shot, so he was ahh.  It was just a moaning noise.
22

23   RT 4733-34 (JB).

24   The Court also heard considerable testimony about the effect that CDP had on the neighborhood

25   where it conducted its affairs.  CDP members recruited boys through money and attention, leading them

26   to do things like hold weapons for CDP members.

27   Q.  You said you moved when you were 12 or 13, in that time frame?
     A.  Yes. Around 13.
28   Q.  And you said you were carrying guns?

U.S. SENTENCING MEMORANDUM
CR 13-00764 WHO                                    7

A.  Yes.

Q.  Tell us about that.  Why were you carrying guns?

A.  Holding guns for older people for my neighborhood.

Q.  Like who?

A.  Edward, Julius, Alfonzo Williams.

Q.  And what, if anything, would you do with those guns that you were carrying?

A.  I would hold them.  That means I will conceal them, keep them on my waist and just basically conceal them.  Had them in my waist – on my waistline where the police or no one else can see them.

Q.  And did anybody ask you to do anything in particular with the guns, aside from just hold them?  Could you just keep them or did you have to give them back?

A.  I give them back to the – to the – yeah.  I give them back.  Basically I was holding them so if the police searched . . . Basically I would hold the guns for the older members of the group so if the police searched them, they were basically – they wouldn't think it was me because I was young and they wouldn't go to jail.  Basically I was holding guns for older members of the group so they won't go to jail if the police search them.

RT 4411-4413 (JB).  The Court witnessed testimony from victims who had been pimped out by CDP members and who had been robbed at gunpoint.  The Court was presented with a number of dead young men, one of whom was gunned down in his mother's driveway, and the brother of an earlier victim who was celebrating the Giants' World Series.  This was all because of the war that broke out following the Andre Helton homicide.

The fact that the murders at issue in this case were in aid of racketing is also significant.  Any homicide is a terrible crime, but VICAR murders are especially pernicious because of their connection with a continuing criminal enterprise.  A person robbing a liquor store who panics and shoots a clerk has committed one of the most serious crimes possible.  However, such an act may not be repeated by that defendant.  On the other hand, murders committed to gain entrance into or to increase or maintain a person's position within a RICO enterprise are not one-time mistakes.  Instead, they are part of the very fabric of the gang's existence.  Further, as seen here, such murders can result in a string of reprisals, leaving families like the Heltons with multiple lost sons.

With respect to the history and characteristics of the defendant, Reginald Elmore is a person who will open fire on a funeral.

1    Defendant's history shows consistent pattern of violence and criminal conduct that has

2    been interrupted only by time spent in custody.  Elmore earned classification as a CHC VI—the

3    highest criminal history category—by the time he was 23 years old.  PSR ¶¶ 85-88.  His roles in

4    the August 2008 double murder and the January 2009 funeral shooting indicate that the public

5    needs protection from him.

6    With respect to deterrence, a lengthy sentence is necessary for specific deterrence by preventing

7    Defendant from committing more crimes.  It is also necessary for general deterrence, because a

8    substantial prison term may serve to deter criminal conduct for those already in gang life.

9    The counts to which Defendant Elmore pleaded guilty are among the most serious crimes in the

10   justice system, and they demand significant punishment.  Participation in a RICO enterprise, knowing

11   and agreeing that its members will commit murder, destroys communities.  Such gangs rob people of

12   their sense of security; they kill rival gang members and innocent bystanders; they create violence that

13   reverberates throughout the community; and they ensnare young people.  VICAR murder, and using a

14   firearm in connection with a VICAR murder, requires the most serious sanction available to the Court,

15   which in this case is a long term in prison.

16   In terms of the need to avoid unwarranted sentencing disparities among defendants with similar

17   records who have been found guilty of similar conduct, the Court has two clear corollaries in Charles

18   Heard and Adrian Gordon.  Charles Heard was convicted of the same crimes to which Defendant

19   Elmore pleaded guilty—conspiracy to participate in the CDP RICO enterprise, knowing that it involved

20   murder; and the murders of Isiah Turner and Andre Helton using a firearm.  The Court sentenced Heard

21   to multiple terms of life imprisonment for these offenses.  Dkts. 1850, 1855.  Like Defendant Elmore,

22   Heard's adjusted offense level was 43, and his CHC was VI.  Defendant Gordon was also convicted of

23   RICO conspiracy, but his secondary offense was the attempted VICAR murder of Patrick McCree.  He

24   was not convicted of VICAR murder or using a firearm in connection with a murder.  The Court

25   sentenced Gordon to a term of 27 years.  Dkts. 1901, 1905.  Gordon's adjusted offense level was 43, and

26   his CHC was VI, just like Heard and Elmore.

27   Because Elmore committed both the VICAR murders of Isiah Turner and Andre Helton and the

28   attempted murders of the January 2009 funeral attendees, an appropriate sentence lies between the poles

U.S. SENTENCING MEMORANDUM
CR 13-00764 WHO                                        9

1 of life imprisonment and 27 years.   In some ways, Elmore is more culpable than Heard for the August

2 2008 double murder.  The evidence in the Group One trial established that Heard set up the murder, but

3 he was not the person who pulled the trigger.  Elmore did.  At the same time, however, Defendant

4 should receive some consideration for sparing the victims' families and the witnesses the ordeal of a

5 second trial.  Granted, Elmore pleaded at the eleventh hour, just a day before jury selection, but there

6 still was no trial.  Therefore, the Court should sentence Elmore to a term less severe than what it

7 imposed on Heard.

8       Turning to Adrian Gordon, even if the Court sets aside Elmore's role in the double murder,

9 Elmore merits a longer sentence that Gordon.  Both defendants were members of CDP, but the evidence

10 at trial was that Elmore was a more significant player in the enterprise.  Gordon was originally a

11 member of KOP; in fact, he even had a KOP tattoo.  RT 4445-46 (JB).  Over time, however, he grew

12 closer to KOP members and claimed CDP, going so far as to indicate that he was "all in 237."  RT 4445-

13 46 (JB); Ex. 109A (Gordon messages).  By contrast, Elmore had such status within CDP that he could

14 direct junior members to do things such as accept responsibility for illegal firearms, and he gave them

15 instructions on how to commit crimes.  RT 4465, 4605 (JB).  Further, while the evidence established

16 that both Gordon and Elmore attempted to kill other people, Elmore's attempted murder is substantially

17 more troubling.  Gordon and an accomplice targeted Patrick McCree, a person whom CDP believed was

18 connected to KOP.  For his part, Elmore sprayed bullets into a crowd of mourners at a funeral, a group

19 that included family of the deceased, members of the community, and others who had no role in the

20 Uptown / Downtown feud or the KOP / CDP gang war.  *See* Ex. 389 (video of funeral shooting).  For

21 these reasons, the Court should impose a more significant sentence on Elmore than it did on Gordon,

22 even in the absence of Elmore's culpability for the Isiah Turner and Andre Helton murders.

23       Although the sentences for Heard and Gordon serve as the ceiling and the floor for the Court's

24 consideration of unwarranted sentencing disparities, the defense will likely point instead to the terms to

25 which the parties anticipate the Court will sentence Alfonzo Williams and Antonio Gilton: 25 years and

26 between 20 and 25 years, respectively.  While those defendants were part of CDP, were part of the same

27 trial group as Elmore, and will be sentenced on the same day, they are in a different position.  The most

28 significant difference is that those defendants accepted responsibility for their conduct—specifically,

U.S. SENTENCING MEMORANDUM
CR 13-00764 WHO                    10

1  their role in the murder of Calvin Sneed.

2       Elmore pleaded guilty to one of the counts related to the August 2008 double murder, but he did

3  so by expressly relying on a theory of *Pinkerton* liability.  Despite all the evidence establishing that he

4  was the shooter, Elmore continues to maintain that he played no role in that homicide.  By contrast, both

5  Alfonzo Williams and Antonio Gilton admitted that they played a major role in the Sneed murder.   In

6  his plea agreement, Antonio Gilton admits the following:

7       With respect to Count Four, on or about June 4, 2012, I participated in the murder of
     Calvin Sneed.  Prior to the murder, I agreed with others to kill Sneed.  On or about June

8       4, 2012, I along with others spotted Sneed driving in a car on the streets of San Francisco.

9       One or more of us possessed firearms at that time.  One of us fired a gun and shot Sneed.
     He died as a result of his gunshot wounds.  A substantial purpose for this murder was to

10       maintain and increase position in the enterprise [CDP].

11

12  Dkt. 2113, ¶ 2 (May 31, 2019 Plea Agreement).

13       Second, the motivation to kill Sneed, while enterprise-related, was markedly different than the

14  motive to kill Isiah Turner and Andre Helton.  The latter two were killed because Elmore believed that

15  there was a bounty on Turner's head and because of perceived disrespect by Helton.  Sneed was killed

16  because he was pimping out the minor cousin of Antonio Gilton, a girl who was also the daughter of

17  Alfonzo Williams' good friend.  While the killing of Sneed was a serious crime, these circumstances

18  serve as partial mitigation and indicate that a 25 year term is appropriate for those defendants.

19       Finally, the adjusted offense levels and criminal history categories for Alfonzo Williams and

20  Antonio Gilton are lower than for Defendant Elmore.  Both have an adjusted offense level of 41;

21  Williams is a CHC II; and Gilton is a CHC IV.

22  *//*

23  *//*

24  *//*

25  *//*

26  *//*

27  *//*

28

1

## CONCLUSION

2    For the reasons presented above and in its previous sentencing memoranda, the government

3    respectfully requests that the Court sentence Defendant Reginald Elmore to a term of 420 months'

4    imprisonment, followed by five years of supervised release, and a $200 special assessment.

5

6    DATED: September 25, 2019                    Respectfully submitted,

7                                                DAVID L. ANDERSON
                                                 Acting United States Attorney

8                                                _____/s/_____

9                                                KEVIN J. BARRY
                                                 Assistant United States Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. SENTENCING MEMORANDUM
CR 13-00764 WHO                              12