1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,              Case No.  3:13-cr-00764-WHO-6

               Plaintiff,
8                                            **ORDER ON MOTION TO VACATE
9          v.                                CONVICTION**

10   REGINALD ELMORE,                        Re: Dkt. Nos. 2399, 2427, 2446

               Defendant.
11

12

13                            **INTRODUCTION**

14         Reginald Elmore pleaded guilty to Racketeer Influenced and Corrupt Organizations

15   ("RICO") Act conspiracy and use or possession of a firearm in the course of a crime of violence

16   that caused the death of another under 18 U.S.C. § 924(j).  He moves to vacate his Section 924(j)

17   conviction under 28 U.S.C. § 2255 in light of the Supreme Court's decisions in *United States v.*

18   *Davis*, 139 S. Ct. 2319 (2019) (which issued after his guilty plea but before sentencing), and

19   *Borden v. United States*, 141 S. Ct. 1817 (2021) (which issued after he began serving his

20   sentence).  Since the parties filed their initial briefs, the Ninth Circuit also issued its *en banc*

21   decision in *United States v. Begay*, 33 F.4th 1081 (9th Cir. 2022).  Now that *Begay* is resolved,

22   this matter is ripe for decision.

23         Section 924(j) authorizes heightened penalties for those who "cause[] the death of a person

24   through use of a firearm" in the course of violating 28 U.S.C. § 924(c).  Section 924(c), in turn,

25   prohibits (among other things) using or carrying a firearm during and in relation to, or possessing

26   a firearm in furtherance of, a "crime of violence."  As Congress wrote the statute, an offense could

27   qualify as a crime of violence under either the "elements clause" or the "residual clause."  In

28   *Davis*, the Supreme Court struck down the residual clause as unconstitutionally vague.

United States District Court
Northern District of California

1   Consequently, to be a crime of violence, an offense must qualify under the elements clause—that

2   is, it must have "as an element the use, attempted use, or threatened use of physical force against

3   the person or property of another."  28 U.S.C. § 924(c)(3)(A).  According to Elmore, his offense

4   qualified as a crime of violence under the now-void residual clause but not under the still-valid

5   elements clause.

6          The motion to vacate Elmore's conviction is denied.  Elmore first argues that, because he

7   pleaded guilty on the basis of *Pinkerton* liability, the predicate offense is conspiracy; after *Davis*,

8   he argues, a conspiracy conviction cannot qualify as a crime of violence.  But because he admitted

9   liability under *Pinkerton*, he pleaded guilty to the substantive predicate offense of murder in aid of

10  racketeering activity (or "VICAR murder"), not the separate offense of conspiracy—something

11  that is both legally true and plain from the plea colloquy.  As a fallback, Elmore argues that, even

12  if the predicate offense is VICAR murder, his conviction is unlawful because VICAR murder

13  cannot qualify as a crime of violence when based on California law after *Borden*, which held that

14  offenses with a *mens rea* of ordinary recklessness are not crimes of violence.  That argument also

15  fails: the VICAR murders here that form the predicate for the Section 924(j) conviction are, in

16  light of *Begay*, crimes of violence even after *Davis* and *Borden*.

**BACKGROUND**

18         The government filed a superseding indictment against Elmore and others on January 9,

19  2014, *see* Dkt. No. 1, and a second superseding indictment on August 14, 2014, *see* Second

20  Superseding Indictment ("Indict.") [Dkt. No. 139].  The operative indictment charged Elmore with

21  four offenses: violation of the RICO conspiracy, two counts of murder in aid of racketeering

22  (sometimes called VICAR murder), and use or possession of a firearm in the course of the VICAR

23  murders.  *Id.* at 6–9, 17–18.[1]  The last count—Count 8 of the Indictment—was brought under 18

24  U.S.C. § 924(j), for use or possession of a firearm during the course of a crime of violence that

25  resulted in killing.  *Id.*  Count 8 was predicated on Counts 6 and 7 of the Indictment.  *Id.* ¶ 33.

26

27  ─────────────────

28  [1] The Indictment also charged many other individuals, including for the same counts as Elmore. The charges against them are not relevant; this section discusses the charges only as they apply to Elmore.

Count 6 charged Elmore with the VICAR murder of Andre Helton; Count 7 charged Elmore with the VICAR murder of Isaiah Turner. *See id.* ¶¶ 28–31. Both counts alleged that the murders occurred on or about August 14, 2008. *Id.* ¶¶ 29, 31. Both counts alleged that Elmore murdered Helton and Turner "in violation of California Penal Code Sections 187, 188, 198, and 31–33." *Id.* And both counts alleged that these murders, in violation of California law, occurred "[a]ll in violation of Title 18, United States Code, Sections 1959(a)(1) and 2." *Id.*

On May 3, 2019, Elmore pleaded guilty to RICO conspiracy and the Section 924(j) offense. *See* May 3, 2019 Transcript ("Plea Trans.") [Dkt. No. 2379] at 5:23–19:23. In exchange for his agreement to seek a sentence of no fewer than 20 years, the government dismissed the VICAR murder counts. *Id.* at 3:6–23, 11:2–6.

Several sections of the plea colloquy are relevant here. First, before Elmore was present, Elmore's counsel began the proceeding by laying out the terms of the plea bargain. The agreement was "in rough terms" that Elmore would plead guilty to the RICO conspiracy charge and "he would also plead to Count 8, which is a 924(j) count on a *Pinkerton* theory." *Id.* at 3:11–13. Later, the prosecutor stated,

> We do not require that Mr. Elmore admit to *Pinkerton* liability for the VICAR murder; but in order for the 924(j) charge to have a sufficient factual basis, Mr. Elmore does have to admit that that happened. You know, so someone committed a VICAR murder of Mr. Turner and Mr. Helton. He doesn't have to say "It was me." He doesn't have to say "I'm liable for it," but he has to admit that that happened.

*Id.* at 4:12–18. After a pause in proceedings, the prosecutor said, "I'm sorry. That's right, Your Honor. I misspoke. Yeah, he does not have to be convicted of that charge but he has to say 'I'm liable for it . . . because it happened under *Pinkerton*, and I'm liable under *Pinkerton* even though I'm not pleading guilty to that charge.'" *Id.* at 5:1–7. Elmore's counsel interjected partway through this statement to say, "[r]ight." *Id.* at 5:4.

Then, with Elmore present, the parties and I went through the colloquy. After ensuring that the plea was knowing, intelligent, and voluntary, I said, "[i]t's my understanding that you'd be pleading open to Count 1 of the Indictment, which is the RICO enterprise charge; and then Count 8, which is the 924(j) charge, and that that carries with it—may carry with it the *Pinkerton*

3

1   liability.  So did you discuss all of that with your counsel?"  *Id.* at 7:8–13.  Elmore responded,

2   "[y]eah, I discussed that."  *Id.* at 7:14.  I said, "[a]nd you would not be pleading to the VICAR

3   murder; correct?"  *Id.* at 7:15–16.  Elmore replied, "[t]hat's correct."  *Id.* at 7:17.  I continued with

4   the required inquiries of and cautions to Elmore.

5        Later, after going through the elements of the first charge that Elmore was pleading to, the

6   prosecutor stated that the elements for the Section 924(j) charge were:

7        First, [Central Divisadero Playas ("CDP")] was a criminal enterprise that existed from at
     least April 2007 through at least 2014; CDP engaged in racketeering activity and affected
8        interstate commerce; third, a person committed the murders of Isaiah Turner and Andre
     Helton on August 14th, 2008; fourth, the person knowingly used a firearm to cause the
9        murders of Isaiah Turner and Andre Helton, that is, the unlawful killing with malice
     aforethought of a person; fifth, the murders were committed as consideration for a promise
10       or agreement to pay anything of pecuniary value from CDP, for the purpose of gaining
     entrance to CDP, or to maintain and increase position in CDP; sixth, the person who
11       committed the murders was a member of the conspiracy charged in Count 1, that is CDP;
     seventh, Mr. Elmore was a member of the same conspiracy at the time the murders were
12       committed; and, finally, the murders of Isaiah Turner and Andre Helton with a firearm fell
     within the scope of the unlawful agreement and could reasonably have been foreseen to be
13       a necessary or natural consequence of the unlawful agreement.

14

15   *Id.* at 13:1–20.  I asked Elmore's counsel if he agreed that "those are the elements of that charge"

16   and he said that he did.  *Id.* at 13:21–23.  I asked Elmore if he "underst[ood] the elements of the

17   offenses that the Government would have to prove in order to convict you?"  *Id.* at 13:24–14:1.

18   He replied that he did.  *Id.* at 14:2.

19        Each party then went through the factual basis underpinning the plea.  The government's

20   representation about the Section 924(j) offense was as follows:

21       So with respect to Count 8, the Government does not expect and does not anticipate that
     Mr. Elmore would admit this, but the Government would be prepared to prove beyond a
22       reasonable doubt that Mr. Elmore actually committed the murders of Isaiah Turner and
     Andre Helton in a car outside the University of San Francisco on October – on August
23       14th, 2014 – I'm sorry – 2012.

24   *Id.* at 17:3–9.  Elmore's counsel interjected to say "2008" and the government resumed:

25       Yes. August 14th, 2008.

26       But for the purpose of this plea, the Government would definitely establish that some
27       person associated with CDP killed Isaiah Turner and Andre Helton on August 14th, 2008;
     that the person did so with a firearm by shooting them both in the head; that the person
28       caused the murder through the use of a firearm; that the person was affiliated with CDP;

4

that these murders were in furtherance of CDP activity, either through obtaining a bounty on Isaiah Turner's head or sort of avenging disrespect that Andre Helton was exercising toward members of CDP because as a member of the Uptown Alliance, he was doing work on behalf of the 6th Street Hustle Boys, a rival gang, and that disrespect had to be avenged.

We would establish that Charles Heard set up the murder by indicating that Mr. Turner would be participating in a house robbery; that the victims were found sitting in a car with gloves on their hands or were in the process of putting on gloves; that Mr. Helton was sitting on a firearm; that DNA evidence linked Mr. Heard to the left rear door of that vehicle; and that Mr. Elmore was a part of the CDP conspiracy at the time of the killing; and that it was reasonably foreseeable that someone could commit this type of murder against victims such as Mr. Turner and Mr. Helton within the scope of what CDP was all about.

*Id.* at 17:10–318:9.  I then turned to Elmore's counsel for his response.  He stated:

I would say, first of all, Your Honor, that we do not agree that the Government would be in a position to establish that Mr. Elmore committed the homicides of Mr. Helton and Mr. Turner.

We do acknowledge and believe that the Government would be in a position to prove that on August 14th of 2008 in furtherance of the charged conspiracy, a CDP member used a firearm in a crime of violence that caused the murder of Andre Helton and Isaiah Turner; that Mr. Elmore was a member of the same conspiracy at the time the crime was committed; that the crime was committed as consideration for a promise or agreement to pay something of pecuniary value or for purpose of gaining entrance to or maintaining position in CDP; and that the crime could reasonably have been foreseen to Mr. Elmore to be a natural consequence of the agreement.

*Id.* at 18:10–25.  I asked, "Mr. Elmore, you heard what Mr. Cohen [Elmore's counsel] said.  Was all of what he said true?"  *Id.* at 19:4–5.  Elmore replied, "[y]es, with respect to what my lawyer said, it was true."  *Id.* at 19:6–7.

Elmore pleaded guilty.  *Id.* at 19:13–15.  I accepted his plea and adjudged him guilty.  *Id.* at 19:16–23.

I held Elmore's sentencing hearing on October 4, 2019.  *See* October 4, 2019, Transcript [Dkt. No. 2195].  I stated, "but I guess we ought to address that question, which is whether the sentence– when I'm thinking about the sentence, [whether] I should be thinking that Mr. Elmore committed that murder."  *Id.* at 10:8–15.  I explained, "[s]o let me tell you that I'm not planning to sentence him based on the double murders."  *Id.* at 10:16–17.  I said, "I think there was good reason for the Government not to pursue the U.S.F. murder with Mr. Elmore, and I don't think that the evidence is sufficient for me to consider it when I'm sentencing him."  *Id.* at 11:9–12.  The

government strenuously argued that the sentence should reflect that Elmore committed (or directly participated in) the underlying murders, but I said that, "[y]ou're not going to convince me to change the perspective that I have, which is that to me this – whether – if there was a second person in the car [when the murders occurred], whether it was Mr. Elmore, is an open question to me, and you're not going to solve it because I think there's evidence both ways." *Id.* at 20:8–13. The government reiterated that argument a number of times to increase the sentence. At one point, I replied that "I didn't make that finding." *Id.* at 49:13–14. When sentencing Elmore, I made the point again: "[y]ou did not commit–I don't find that you committed a murder." *Id.* at 50:14–15.

I sentenced Elmore to a sentence of 264 months: 144 on the RICO conspiracy and 120 on the 924(j) violation to be served consecutively. *Id.* at 50:24–51:3; *see also* Amended Judgment [Dkt. No. 2216].

After the sentence was pronounced, the prosecutor stated, "Your Honor, Mr. Elmore complied with the terms of his agreement, but we will– we're just going to wait until the time for appeal has passed and then we'll dismiss the remaining counts." *Id.* at 55:23–56:1. Elmore's counsel responded, "[t]hat's actually not what the agreement was, Your Honor. It was that it would be dismissed at the time of sentencing." *Id.* at 56:2–4. The prosecutor replied, "[w]ell, I don't have that actually recollection so I'll take Mr. Cohen at his word; and if those are the terms, then we'll dismiss now." *Id.* at 56:8–10. I dismissed the other counts. *Id.* at 56:12–13.

Elmore's counsel did not file a notice of appeal. In a declaration that Elmore filed with his original petition here, he stated that he asked his attorney to file an appeal on the day of his sentencing hearing. *See* Affidavit in Support of Petition for Writ of Habeas Corpus ("Elmore Decl.") [Dkt. No. 2401 at 18]. He said that he reiterated the request on October 18, 2019, and that he wanted to pursue an appeal in light of *Davis*, which the Supreme Court handed down on June 24, 2019. *Id.*

Elmore filed a *pro se* appeal on March 19, 2020, arguing that his counsel was constitutionally ineffective. Dkt. No. 2320. On July 17, 2020, the Ninth Circuit dismissed the appeal as untimely. Dkt. No. 2350. It explained that it "decline[d] to reach on direct appeal appellant's claim that his counsel was ineffective for failing to file a timely notice of appeal" but

United States District Court
Northern District of California

that "[s]uch a claim may be raised in a collateral attack under 28 U.S.C. § 2255." *Id.* (internal citations omitted).

Elmore filed a *pro se* habeas petition on September 17, 2020. Dkt. Nos. 2399, 2401. I appointed him counsel under the Criminal Justice Act, Dkt. No. 2409, ordered the government to respond to the petition, Dkt. No. 2423, and permitted Elmore's counsel to file an amended petition, *id.* Elmore, represented by counsel, filed his amended motion on December 9, 2020. *See* Amended Motion to Vacate ("Mot.") [Dkt. No. 2427]. The government filed its Opposition in March 2021, *see* Opposition to the Mot. ("Oppo.") [Dkt. No. 2445], and also moved for discovery on Elmore's allegations of ineffective assistance of counsel, *see* Motion for Discovery [Dkt. No. 2446]. Elmore filed his reply and an opposition to the motion for discovery in May 2021. *See* Reply to Oppo. ("Reply") [Dkt. No. 2455]; Response to Motion for Discovery [Dkt. No. 2456]. In October 2021, I requested that the parties submit supplemental briefing to address the impact (if any) of *Borden*. *See* Dkt. No. 2482. The government filed its brief in November 2021 and Elmore filed his brief in December 2021. *See* Supplemental Memorandum in Opposition ("Gov. Supp.") [Dkt. No. 2491]; Supplemental Reply ("Elmore Supp.") [Dkt. No. 2496]. On May 5, 2022, the Ninth Circuit issued its *en banc* opinion in *Begay*. In light of *Begay*, I requested another supplemental brief from the government on the issues that Elmore raised for the first time in his supplemental brief, which it submitted in July 2022. *See* Second Supplemental Opposition ("Gov. 2d Supp.").[2]

## LEGAL STANDARD

Under 28 U.S.C. § 2255, persons "in custody under sentence" of a federal court "may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render

---

[2] The government's brief was filed long after the deadline I set, *see* Dkt. No. 2513, for which the government has apologized, *see* Gov. 2d Supp. 1 n.1. I will exercise my discretion to consider it because the briefing became necessary as a result of issues Elmore raised in his supplemental brief.

1   the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and

2   shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may

3   appear appropriate." *Id.* § 2255(b).

4                                     **DISCUSSION**

5   **I.      PROCEDURAL DEFAULT**

6           As Elmore admits, *see* Mot. 10, he procedurally defaulted his claim by failing to raise it in

7   the underlying proceeding. *See Bousley v. United States*, 523 U.S. 614, 621–22 (1998). He

8   contends, however, that two exceptions to the default rule apply: "cause and prejudice" due to

9   ineffective assistance of counsel ("IAC") and "actual innocence." Mot. 10. If Elmore were

10  correct that his conviction is unlawful after *Davis* and *Borden*, he would be able to invoke the

11  actual innocence exception because he would have demonstrated that, "in light of subsequent case

12  law [] he cannot, as a legal matter, have committed the alleged crime." *Vosgien v. Persson*, 742

13  F.3d 1131, 1134 (9th Cir. 2014). Because I conclude that Elmore is incorrect on the merits of his

14  argument, his motion to vacate is denied anyway. Either way, there is no need to delve into the

15  fact-intensive IAC matter; the government's motion for discovery about it (Dkt. No. 2446) is

16  DENIED AS MOOT. And either way, there is no need to further analyze the default issue. I

17  proceed to the merits.

18  **II.     LAWFULNESS OF CONVICTION**

19          Elmore challenges his conviction under 18 U.S.C. § 924(j) as unlawful in light of the

20  Supreme Court's decisions in *Davis* and *Borden*. For the reasons that follow, I reject his

21  argument.

22          **A.  Legal Framework**

23          Before discussing Elmore's arguments, I begin with concepts necessary to understanding

24  this motion: the statutory framework of Section 924(j) and the "categorical approach" to applying

25  it, and the VICAR murder statute.

26                      **i.     Section 924(j) and the Categorical Approach**

27          18 U.S.C. § 924(j) is a firearm-based penalty enhancement statute. As relevant here, it

28  provides that "[a] person who, in the course of a violation of subsection (c), causes the death of a

United States District Court
Northern District of California

person through the use of a firearm, shall—[] if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life."

Section 924(j), consequently, depends on a violation of 18 U.S.C. § 924(c).  Section 924(c) provides in relevant part,

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime[ be punished in specified ways.]

18 U.S.C. § 924(c)(1)(A).  This case involves alleged "crimes of violence" as the predicate offense.  The statute defines a "crime of violence" as "an offense that is a felony and—(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 924(c)(3).  The first of these clauses is often called the "elements" or "force" clause; the second is often called the "residual clause."

In *Davis*, the Supreme Court held that Section 924(c)'s residual clause was unconstitutionally vague.  *Davis*, 139 S. Ct. at 2336.  After *Davis*, an offense can qualify as a crime of violence only by falling under the elements clause: it must be a felony and have "as an element the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(3)(A).

To determine whether an offense qualifies under the elements clause, courts generally employ the categorical approach set out in *Taylor v. United States*, 495 U.S. 575 (1990).  *See Borden*, 141 S. Ct. at 1822 (plurality opinion).  "Under that by-now-familiar method, applicable in several statutory contexts, the facts of a given case are irrelevant.  The focus is instead on whether the elements of the [predicate statute] meet the federal standard.  *Id.*  "[I]n order for a violation . . . to qualify as a predicate offense, the full range of conduct [it] cover[s] must fall within the scope of the" elements clause.  *United States v. Pallares-Galan*, 359 F.3d 1088, 1099–100 (9th Cir.

United States District Court
Northern District of California

2004) (internal quotation marks omitted).  So if the "least egregious" conduct criminalized by the offense does not qualify, the offense and the statute are not a categorical match.  *United States v. Baza-Martinez*, 464 F.3d 1010, 1014 (9th Cir. 2006) (internal quotation marks and citation omitted).

Sometimes, courts employ the "modified" categorical approach set out in *Shepard v. United States*, 544 U.S. 13 (2005).  *See, e.g.*, *Mathis v. United States*, 579 U.S. 500, 505 (2016). That approach is used when a statute is "divisible"—that is when it "list[s] elements in the alternative, and thereby define[s] multiple crimes."  *Id.*  To determine whether a conviction is a sufficient predicate, the court has to "determine what crime, with what elements, a defendant was convicted of" or that serves as the predicate.  *Id.* at 505–06.

When employing either approach under Section 924(c), the predicate offense must necessarily involve a defendant's "use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(3)(A).  Generally, the "physical force" in the statute means "*violent* force—that is, force capable of causing physical pain or injury to another person."  *Johnson v. United States*, 559 U.S. 133, 140 (2010) (defining the term in subsection (e)); *United States v. Watson*, 881 F.3d 782 (9th Cir. 2018) (applying the definition to subsection (c)).

In *Borden*, the Supreme Court addressed the *mens rea* necessary for an offense to qualify under the materially identical elements clause of 18 U.S.C. § 924(e).  It had previously held that, when it came to another federal statue using materially identical language, a defendant who acted with only a negligent *mens rea*, did not use force "against" another as the statute used the term. *See Leocal v. Ashcroft*, 543 U.S. 1 (2004).  *Borden* extended that holding to those who act with a *mens rea of* ordinary recklessness.  *Borden*, 141 S. Ct. at 1827 (plurality opinion); *id.* at 1836–37 (Thomas, J., concurring in the judgment).  In other words, those who act with a *mens rea* of ordinary recklessness do not commit a crime of violence.  But *Borden* explicitly left open the question whether a *mens rea* of "depraved heart" or "extreme recklessness" qualified too—mental states it described as being "between recklessness and knowledge."  *Borden*, 141 S. Ct. at 1825 n.4 (plurality opinion).

United States District Court
Northern District of California

In *United States v. Begay*, 33 F.4th 1081 (9th Cir. 2022) ("*Begay II*") an *en banc* Ninth Circuit took up part of *Borden*'s unanswered question.  It held that second-degree murder under 28 U.S.C. § 1111(a) is a "crime of violence" under Section 924(c) even though it had a *mens rea* lower than intent or knowledge.  *Begay II*, 33 F.4th at 1091.  (The three-judge panel had initially determined that such a *mens rea* meant the offense could not qualify as a crime of violence.  *See United States v. Begay*, 934 F.3d 1033 (9th Cir. 2019) ("*Begay I*").)  The court explained that "murder" requires that the unlawful killing be "with malice aforethought."  *Begay II*, 33 F.4th at 1091 (quoting 18 U.S.C. § 1111(a)).  Malice aforethought means "a callous and wanton disregard of human life, and extreme indifference to the value of human life."  *Id.* (internal quotation marks and citations omitted).  It encompasses four mental states: (1) intent to kill; (2) intent to do serious bodily injury; (3) depraved heart (i.e., reckless indifference); and (4) intent to commit a felony."  *Id.* (internal quotation marks and citation omitted).  No one disputed that the three mental states involving intent were sufficient after *Borden* to qualify the offense as a crime of violence, so the Ninth Circuit focused on the fourth—"depraved heart" or "reckless indifference"—as it was the least culpable and the one that potentially disqualified the offense.  *See id.*

The court held that the crime of murder committed with a *mens rea* of a "depraved heart" was a "crime of violence."  *Id.*  The recklessness required for depraved-heart murder, the court explained, was recklessness "with extreme disregard for human life."  *Id.* at 1093 (citation omitted).  It requires "a quantum of risk that is very high and also requires that the nature of the risk concern injury to others."  *Id.* (citation omitted).  As a result, the court held that a defendant who acts with that *mens rea* "necessarily employs force against the person or property of another, and rather than acting with ordinary recklessness, the defendant acts with recklessness that rises to the level of extreme disregard for human life."  *Id.* (internal quotation marks omitted).

In sum, after *Davis*, *Borden*, and *Begay II*, offenses with a *mens rea* of negligence or ordinary recklessness cannot serve as Section 924(c) predicates.  Murder with a *mens rea* of malice aforethought of the sort analyzed in *Begay II* can do so (provided that it is a categorical match in all other ways).

### ii.     VICAR Murder

18 U.S.C. § 1959 criminalizes certain "violent crimes in aid of racketeering activity," often called "VICAR."   It provides that,

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do shall be punished [in various enumerated ways.]

18 U.S.C. § 1959(a).  Each of the enumerated acts—murder, kidnapping, etc.—are then listed as receiving separate punishments.  *See* 18 U.S.C. § 1959(a)(1)–(6).  When the relevant act is murder, it is often referred to as VICAR murder.  *See, e.g.*, *United States v. Vasquez-Velasco*, 15 F.3d 833, 842 (9th Cir. 1994).

There are several possible theories of liability under the VICAR statute.  In a case like this, the elements of  VICAR murder are generally given as: (1) that the enterprise exists; (2) that the enterprise is engaged in racketeering activity; (3) that the defendant committed or participated in the murders; and (4) that the defendant acted for the purpose of gaining entrance to or maintaining or increasing position in the enterprise.  *See Vasquez-Velasco*, 15 F.3d at 842. *Cf. United States v. Banks*, 514 F.3d 959, 964 (9th Cir. 2008) (listing elements when charge is a violent crime, not murder).

### B.  Whether the Predicate Crime is Conspiracy or Murder

With this groundwork laid, I turn to Elmore's arguments for vacating his conviction.

The parties first dispute what offense was the predicate for Elmore's Section 924(j) conviction.  Both parties agree that Elmore pleaded guilty under principles of *Pinkerton* liability.  But they draw different conclusions from that fact.  According to Elmore, the predicate crime is "conspiracy" and conspiracy does not qualify as a crime of violence under Section 924(c).[3]  *See*

---

[3] Elmore's motion was equivocal about what he believes the precise predicate crime was.  He argued it was either conspiracy to violate RICO or conspiracy to commit violent crimes in aid of racketeering.  *See* Mot. 6–9.  In his reply, he appeared to fully endorse the former.  Reply 9–10 ("The predicate for Count 8, relying on the plea colloquy, was the conspiracy in Count 1.").

United States District Court
Northern District of California

United States District Court
Northern District of California

Mot. 4.  According to the government, *Pinkerton* liability *is* liability for the substantive underlying offense—here, the VICAR murders.  Oppo. 7–8.  Said otherwise, Elmore contends that the predicate offense is "conspiracy"; the government argues that the predicate offense is "murder in aid of racketeering."  For the reasons that follow, the government's understanding of *Pinkerton* liability is correct.

"Conspiracy" liability comes in two forms, depending on the jurisdiction or statute at issue.  The first form is when *conspiracy itself* is a criminal offense.  Take the general federal conspiracy statute, which provides that "[i]f two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371.  Under that statute, committing conspiracy is itself a crime.  *See, e.g.*, *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016).  Or take what is sometimes termed "RICO conspiracy" or "conspiracy to violate RICO" under 18 U.S.C. § 1962.  That statute provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d); *see Salinas v. United States*, 522 U.S. 52, 63 (1997) (laying out the offense's further requirements).  Or, as a final example, take California's general conspiracy statute, which renders criminal "two or more persons conspiring to commit any crime together with proof of the commission of an overt act by one or more of the parties to such agreement in furtherance thereof."  *People v. Swain*, 12 Cal. 4th 593, 600 (1996) (quoting Cal. Pen. Code §§ 182, 184) (internal quotation marks and alterations omitted).  In each case, a defendant violates the statute when he commits the requisite acts with the requisite *mens rea* (which depend on the particular formulation, but are often (1) an agreement, (2) an overt act, and (3) specific intent).

*Pinkerton* liability is different.  Stemming from the Supreme Court's decision in *Pinkerton v. United States*, 328 U.S. 640 (1946), *Pinkerton* liability is "a judicially-created rule that makes a conspirator criminally liable *for the substantive offenses committed by a co-conspirator* when they are reasonably foreseeable and committed in furtherance of the conspiracy."  *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002) (emphasis added).  In this way, *Pinkerton* liability is

1    unlike the other form of conspiracy liability described above.  In the form above, defendants are

2    liable for the offense of conspiracy.  Under *Pinkerton*, the defendants "are treated as if they

3    committed the [substantive underlying] offense as principals."  *United States v. Henry*, 984 F.3d

4    1343, 1356 (9th Cir. 2021).  In this sense, *Pinkerton* liability is similar to "aider-and-abettor

5    liability."  *See id.* (explaining that the doctrines are comparable in this way).  Under a common

6    formulation of aider-and-abettor liability, one who "aids, abets, [or] counsels" an offense "is

7    punishable *as a principal*."  18 U.S.C. § 2 (emphasis added); *see also Ortiz-Magana v. Mukasey*,

8    542 F.3d 653, 659 (9th Cir. 2008).  So it is with *Pinkerton* liability: the defendant is treated the

9    same as the principal and convicted of the substantive underlying offense.

10         To give an illustration of the impact of the difference between stand-alone conspiracy

11   statutes and liability under *Pinkerton*, consider armed bank robbery.  In the first form of

12   conspiracy liability discussed above (a stand-alone conspiracy statute), a defendant who conspires

13   to commit armed bank robbery, but does not carry out the offense of bank robbery as a principal,

14   has committed the offense *of conspiracy*.  Under *Pinkerton*, a defendant who conspires to commit

15   armed bank robbery, but does not carry out the offense of bank robbery as a principal, has

16   committed the offense *of armed bank robbery* (assuming that the other elements of *Pinkerton* are

17   met).  *See Henry*, 984 F.3d at 1355–56 (so holding).

18         With this distinction drawn, the resolution of this part of the parties' dispute is

19   straightforward.  Both parties agree—as do I, and as the record recited above makes clear beyond

20   doubt, *see supra* Background—that Elmore, as he puts it, "admitted his liability under section

21   924(j) not because he directly participated in the murder, but under *Pinkerton* liability principles in

22   that the murder was a foreseeable consequence of his involvement in the underlying racketeering

23   conspiracy."  Mot. 1; *see also, e.g., id.* 3 ("[Elmore] was liable on the basis of *Pinkerton* liability.

24   *Pinkerton* liability is a way of holding members of a conspiracy liable for acts committed by other

25   members." (internal quotation marks and citation omitted)); Oppo. 7 ("[Elmore] admitted liability

26   under *Pinkerton*.").  It follows that Elmore pleaded guilty to, and was convicted on the basis of,

27

28

United States District Court
Northern District of California

14

liability for the VICAR murders charged in Counts 6 and 7 under *Pinkerton*.[4]

To be sure, as laid out above, Elmore did not plead guilty *as a principal* (that is, the one who in common parlance would be said to have "committed" the crime) for those murders; I declined to find that he was the principal for sentencing purposes and he was not convicted or sentenced on that basis. But Elmore's guilty plea under *Pinkerton* also means that he did not plead guilty to a stand-alone crime of conspiracy—such as the general federal conspiracy statute, statutory conspiracy to violate RICO, or general conspiracy under California law—and instead pleaded guilty to liability "for the substantive offense[]." *Long*, 301 F.3d at 1103.

The Ninth Circuit's decision in *Henry* reinforces that pleading guilty to a predicate offense under *Pinkerton* can support a Section 924(c) conviction. There, the court first discussed some of the principles above, like the nature of *Pinkerton* liability. *See Henry*, 984 F.3d at 1355. It explained that it has "consistently held that *Pinkerton* liability applies to § 924(c) counts." *Id.* (citing, *e.g.*, *United States v. Luong*, 627 F.3d 1306, 1308 (9th Cir. 2010); *United States v. Allen*, 425 F.3d 1231, 1234 (9th Cir. 2005); *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1203 (9th Cir. 2000); *United States v. Winslow*, 962 F.2d 845, 853 n.2 (9th Cir. 1992)). It then explicitly rejected the argument that *Davis* altered any of this. *Id.* at 1355–56. It explained that, because the defendant was convicted on the basis of *Pinkerton* liability, he was guilty of armed robbery, which qualified as a crime of violence. *Id.* at 1355–56. And, the court said, "[d]efendants found guilty of armed bank robbery under either a *Pinkerton* or aiding-and-abetting theory are treated as if they committed the offense as principals." *Id.* at 1356. Consequently, the court held that,

> [t]his court has repeatedly upheld § 924(c) convictions based on accomplice liability. We have continued to affirm convictions that may have been based on a *Pinkerton* theory in unpublished decisions after *Davis* . . . . *Davis* does not conflict with or undermine the cases upholding § 924(c) convictions based on *Pinkerton* liability.

---

[4] This conclusion does not contradict the dismissal of Counts 6 and 7 themselves as part of the plea agreement: "a defendant charged with violating section 924(c)(1) must be proven to have committed the underlying crime, but nothing in the statute or the legislative history suggests he must be separately charged with and convicted of the underlying offense." *United States v. Hunter*, 887 F.2d 1001, 1003 (9th Cir. 1989).

*Id.* (citations omitted).[5]

Finally, as a factual matter, Elmore pleaded under *Pinkerton* to the charged VICAR murders as the predicate offenses (and not, for instance, to a state-law murder or another count of the Indictment as he argues, *see, e.g.*, Reply 9–10).  As noted, the Indictment itself charged Elmore with violating Section 924(j) by committing the VICAR murders in Counts 6 and 7.  *See* Indict. ¶ 33.  Elmore's plea colloquy illustrates that this was also the basis of his plea.  The government began the relevant part of the proceedings by discussing the VICAR murders—not any other offense—as the predicate for the 924(j) charge.  *See* Plea Tran. at 4:12–5:7.  When the government described the elements of the Section 924(j) charge, it is clear from the substance that the predicate offense was the VICAR murders.  Those elements neatly map onto the elements of a VICAR murder charge but do not map onto any other offense.  *Compare id.* at 13:1–20 (plea colloquy), *with supra* Section A.ii. (elements of a VICAR murder charge).  Elmore's counsel and he both agreed those were the elements.  Plea Tran. at 13:21–14:2.[6]

In short, Elmore admitted under *Pinkerton* that he was liable for the predicate offenses of the VICAR murders charged in Counts 6 and 7 for purposes of pleading guilty to the Section 924(j) charge.

### C.  Whether the Predicate Offense is a Crime of Violence

For the reasons just explained, the VICAR murders charged in Counts 6 and 7 are the predicate of the Section 924(c) offense.  The next question is whether those predicate offenses are still "crimes of violence" after *Davis*, *Borden*, and *Begay II*.

Elmore's original motion argued only that conspiracy did not qualify as a crime of

---

[5] Since *Henry*, the Ninth Circuit has applied it (albeit in unpublished opinions) as I do here to sustain Section 924(c) convictions based on *Pinkerton* liability for the underlying predicate offense—including after *Borden*.  *See United States v. Young*, No. 19-50355, 2022 WL 2356734, at *3 (9th Cir. June 30, 2022); *United States v. Major*, No. 17-16764, 2022 WL 1714290, at *1 (9th Cir. May 27, 2022); *United States v. McShane*, No. 17-16906, 2021 WL 4810501, at *1 (9th Cir. Oct. 15, 2021).

[6] Though the government at one point referenced the "conspiracy charged in Count 1," it is clear in context that reference was just to define the conspiracy at issue, not to render Count 1 the substantive predicate offense (which would not align with the other elements discussed). *See* Plea Tran. at 13:1–20.

violence post-*Davis*.  *See generally* Mot.  The government's opposition argued that conspiracy

was not the predicate offense and that murder was.  *See generally* Oppo.  In response, Elmore's

reply contended, for the first time, that even if the government is correct, the VICAR murders here

do not qualify as crimes of violence under *Begay I*.  *See* Reply 10.  He also referenced that the

Supreme Court had granted certiorari in, but not yet decided, *Borden*.  *Id.* 10 n.2.  Once *Borden*

was handed down, I requested, and the parties provided, briefing on how it affected the case.  *See*

Dkt. No. 2482.  Since then, the Ninth Circuit issued *Begay II*.  Because that decision interacted

with issues Elmore raised for the first time in his supplemental brief, I gave the government the

opportunity to address them.  *See* Dkt. No. 2513.

### i.  Waiver or Forfeiture

As a preliminary matter, the government argues that Elmore "waived" this issue by failing

to raise it in his initial brief.  Oppo. 8–9; Gov. 2d Supp. 3–4.  I disagree that the issue was waived

or, as the government's argument is better characterized, forfeited.  *Cf. United States v. Olano*,

507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture.  Whereas forfeiture is the failure to

make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a

known right." (internal quotation marks and citation omitted)).  Elmore first filed his motion *pro*

*se*, arguing that his conviction was void after *Davis*.  Once he was represented, he filed an

amended motion making much the same argument.  Both motions were premised on the idea that

he was convicted for conspiracy.  In response, the government argued against his premise,

contending that Elmore misunderstood how *Pinkerton* applied.  Elmore's reply brief largely

reiterated his argument that that he was convicted for a conspiracy.  But it also argued that, if the

government is correct about the predicate offense, he is still entitled to have his conviction set

aside.

While I agree with the government that Elmore *could* have raised this issue in his initial

petition, I also agree with Elmore that it was fair to raise it for the first time as a response to the

government's argument.  The issue was, therefore, not forfeited.  Even if it were, I would exercise

my "discretion to forgive any forfeiture."  *Shinn v. Martinez Ramirez*, 142 S. Ct. 1718, 1730 n.1

(2022).  I also gave the government an opportunity to submit two supplemental briefs addressing

1    Elmore's arguments, obviating any prejudice to it. In any event, I find for the government on the

2    merits even of this newer argument.

3                    **ii.      The Structure of a VICAR Murder Offense**

4          On the merits of the argument, the issue is whether the VICAR murders charged in Counts

5    6 and 7 qualify as crimes of violence under Section 924(c). Throughout the briefing, however,

6    there has been some murkiness about the nature of those predicate murders, an issue that is critical

7    to the resolution of this petition. Despite some initial vagueness in the briefing, the dispute has

8    now crystalized into neat opposing positions. Elmore argues that (if he is wrong on conspiracy

9    being the predicate offense), the VICAR murders refer to murders under California state law. *See,*

10   *e.g.*, Elmore Supp. 1 ("[T]he murder statute at issue is California's murder statute."). The

11   government contends that the VICAR murders refer to murder under federal law. *See, e.g.*, Gov.

12   2d Supp. ("[Elmore's] Section 924(j) conviction is based on murder as defined by 18 U.S.C. §

13   1111(a)."). But the issue is somewhat more complicated than either party acknowledges.

14         Count 8 charged Elmore with violating Section 924(j), which prohibits causing the death

15   of another through use of a firearm in the course of violating Section 924(c). *See* 18 U.S.C. §

16   924(j). 924(c) requires some predicate "crime of violence." 18 U.S.C. § 924(c)(1)(A). There are

17   two predicate "crime[s] of violence" referenced in the Indictment: "the murders in aid of

18   racketeering of Andre Helton and Isaiah Turner charged in Counts Six and Seven." Indict. ¶ 33.

19   Counts 6 and 7 each charge Elmore with VICAR murder under 18 U.S.C. § 1959(a)(1) of Helton

20   and Turner, respectively. *See id.* ¶¶ 28–31. That statute, as applied to a murder charge like this,

21   applies to one who "murders . . . any individual in violation of the laws of any State or United

22   States" (and meets the other elements). 18 U.S.C. § 1959(a)(1). The Indictment also makes clear

23   which laws were alleged to be violated (as the statute requires): California Penal Code §§ 187,

24   188, 189, and 31–33. California Penal Code § 187 defines murder; § 188 defines the mental states

25   for murder; § 189 separates murder into first and second degrees; and §§ 31–33 are California's

26   general criminal inchoate and aider-and-abettor liability statutes.

27         The Section 924(j) charge, then, contains multiple layers of references to other offenses,

28   which may explain some of the confusion on this point. But to recap: Section 924(j) is defined in

United States District Court
Northern District of California

1    part by a violation of Section 924(c), which (in this case) is predicated on violations of the VICAR

2    murder statute, which (in this case) depends in part on the two murders committed under

3    California state law.

4         Elmore contends that this means that the VICAR murder charges are, at bottom, predicated

5    on murder under California law.  *See* Elmore Supp. 4–10.  And California-law murder, he asserts,

6    is not a crime of violence even after *Begay II*.  *See id.*  The government argues that the VICAR

7    murders are predicated on the federal-law definition of murder, which *Begay II* held constitutes a

8    crime of violence.  *See* Gov. 2d Supp. 2–3.  In support, the government argues that one line in

9    Count 8—that is, in the Section 924(j) charge itself—means that a federal-law definition of

10   murder prevails.  *See id.* 2 (citing Indict. ¶ 33).  Specifically, Count 8 states that the "killing is

11   murder as defined in Title 18, United States Code, Section 1111(a)," the general federal murder

12   statute.  Indict. ¶ 33.

13        Neither party has it all quite right.  Before explaining why, I make the preliminary point

14   that the government misunderstands the structure of the offenses at issue.  The Section 924(j)

15   charge cannot transform the predicate VICAR murders into something they are not.  The single

16   line that the government points to does not purport to do so: it is in the charge because Section

17   924(j) itself differentiates between predicate offenses that meet the federal definitions of murder

18   and manslaughter respectively.  *See* 18 U.S.C. § 924(j)(1)–(2).  We need to examine the VICAR

19   murder statute to resolve this.

20        The VICAR statute requires a predicate offense—certain enumerated types of crimes

21   committed in "violation of the laws of any State or the United States."  18 U.S.C. § 1959(a)(1).

22   Relevant here, that predicate crime must be "murder[] . . . in violation of the laws of any State or

23   the United States."  *Id.*  There are several potential ways one could interpret this provision.  One is

24   that anything "any State or the United States" labels the crime of "murder" can count as a VICAR

25   predicate.  A second is that the categorical approach should be employed here, and the question

26   should be whether the predicate qualifies as generic murder.

27        I conclude that a third approach is correct: an offense must qualify under state or federal

28   law *and* must qualify as "murder" as the VICAR statute uses that term.  If that interpretation is

United States District Court
Northern District of California

1  correct, it goes a long way to resolving the issues in this case.  The Supreme Court has not

2  addressed this precise issue, and the Ninth Circuit has not done so in a published opinion.[7]  But the

3  only court of appeals to have addressed it has advanced the interpretation I do, as has every district

4  court of which I am aware.  *See United States v. Keene*, 955 F.3d 391 (4th Cir. 2020); *United*

5  *States v. Manning*, No. CR 19-00313 WHA, 2021 WL 4461599 (N.D. Cal. Sept. 29, 2021); *United*

6  *States v. Rivas Gomez*, No. 118CR00002NONESKO, 2021 WL 431409, at *3 (E.D. Cal. Feb. 8,

7  2021); *United States v. Mills*, 378 F. Supp. 3d 563 (E.D. Mich. 2019); *United States v. DeLeon*,

8  318 F. Supp. 3d 1272 (D.N.M. 2018); *United States v. Le*, 316 F. Supp. 2d 355 (E.D. Va. 2004).  I

9  adopt that approach for the reasons that follow.

10          To start, the text of the statute strongly suggests that a defendant's conduct must both

11  qualify as a predicate state or federal offense and qualify as "murder" under the VICAR statute

12  (which, as I explain below, is either the federal definition or a generic definition).  Cutting out

13  some currently irrelevant requirements, the statute states that "[w]hoever" takes certain actions—

14  for instance, "[w]hoever . . . murders"—is liable.  And it states that this "murder[]" must be in

15  "violation of the laws of any State or the United States."  As the Fourth Circuit explained, "the

16  most natural reading of the statute does not require any comparison whatsoever between the two

17  offenses.  By using the verb 'assaults' in the present tense, the language requires that a defendant's

18  presently charged conduct constitute an assault under federal law, while simultaneously also

19  violating a state law."  *Keene*, 955 F.3d at 397.  Replace "assaults" with "murders" and the result

20  does not change.

21          The Supreme Court has held that this type of interpretation is correct when it comes to

22  statutes with similar structures and language.  In *United States v. Nardello*, the Court confronted a

23  statute prohibiting travel in interstate commerce with intent to carry out "extortion . . . in violation

24  of the laws of the state in which committed or of the United States."  393 U.S. 286, 288 (1969)

25  (citing 18 U.S.C. § 1952(b)).  That formulation is essentially the same as in the VICAR statute,

26  and the Court held that in light of its phrasing and the expansive purpose behind it, it reached

27  _____

28  [7] The Ninth Circuit endorsed the basic understanding I reach here in an unpublished, non-precedential opinion.  *See United States v. Joseph*, 465 F. App'x 690, 696 (9th Cir. 2012).

United States District Court
Northern District of California

conduct that was both unlawful under state law and fell within the definition of "generic" extortion.  *See id.* at 288–96.  The Court reached the same conclusion for extortion under RICO— a statute intimately related with the VICAR one here.  *See Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 410 (2003).  The language there is "any act . . . involving extortion . . . which is chargeable under State law."  *Id.* (quoting 18 U.S.C. § 1961(1)).

This approach also coheres with the Ninth Circuit's teachings about how to instruct juries on VICAR charges.  That court has explained that "[i]n the context of VICAR, we have permitted jury instructions using generic federal definitions."  *United States v. Adkins*, 883 F.3d 1207, 1210 (9th Cir. 2018).  And while it has also held that "courts, in certain circumstances, should instruct on the state definition or otherwise risk prejudice to the defendant," *id.*, if the VICAR statute required the categorical approach, omitting any reference to the elements of the state crime would be (at least) anomalous.  Accordingly, the best reading of the statute is that it requires this approach.

The question then becomes what precisely the VICAR statute means by "murder."  It includes no specific statutory definition, so there are two reasonable options: (1) it means the general federal definition of murder under 18 U.S.C. § 1111(a) or (2) it means the "generic" definition of murder.  At its most basic level, Section 1111(a) defines murder as "the unlawful killing of a human being with malice aforethought."  18 U.S.C. § 1111(a).  And the "generic" definition means "the offense as commonly understood."  *United States v. Jones*, 877 F.3d 884, 887 (9th Cir. 2017) (internal quotation marks and citation omitted).  Congress sometimes intends that an otherwise undefined offense take that "generic" meaning.  *See, e.g.*, *Taylor*, 495 U.S. at 600–02.  Courts that have addressed this issue have used one or the other (or sometimes appear to use them interchangeably) without discussing the alternative option.  Indeed, in ruling on a motion to dismiss in this case, both parties (Elmore joined another defendant's motion) treated the relevant definition as the federal statutory one and I ruled on that basis.  *See* Dkt. No. 850.

Here, there is no need to firmly decide which applies because I conclude that, for purposes of this case, the "generic" definition and Section 1111(a)'s definition are the same.  Generally, "[c]ontemporary usage of a term governs its generic definition under the categorical approach."

21

*United States v. Garcia-Santana*, 774 F.3d 528, 534 (9th Cir. 2014) (quoting *Taylor*, 495 U.S. at 592) (internal quotation marks and alteration omitted). Accordingly, courts can "survey the definitions codified in state and federal statutes, adopted by the Model Penal Code ("MPC"), and endorsed by scholarly commentary." *Id.* (citation omitted). The parties here, however, "ha[ve] failed to raise and ha[ve] therefore waived any arguments concerning the MPC, state criminal statutes, or scholarly commentary." *Gomez Fernandez v. Barr*, 969 F.3d 1077, 1086 n.4 (9th Cir. 2020) (citation omitted). In line with the general rule that courts follow the party presentation principle, I need not undertake an examination of those sources in the first instance. *See id.* Instead, the closest thing either party puts forward as a generic definition is Section 1111(a) itself. *See* Gov. 2d Supp. 3 (relying on a prior order in this case that used the federal definition). In fact, the Ninth Circuit has employed that definition for generic murder when no party raised an argument otherwise. *Gomez Fernandez*, 969 F.3d at 1086 & n.4.[8] Accordingly, while I do not foreclose the possibility that a different generic definition would prevail in another case based on those parties' arguments, the federal definition of murder will be treated as generic here. For simplicity, I will often refer only to the generic definition from now on.[9]

Before applying this approach, I briefly address the other two potential interpretations I discussed above; both prove implausible. The first, again, is that the statute criminalizes conduct when it is labelled murder under the law. That reading, to begin, does not fit well with the statute's language for the reasons discussed above. It would also lead to quite an odd result that is both over- and under-inclusive. It would be over-inclusive in that it would give unilateral authority to states to transform any act into a VICAR predicate by labelling it murder. It would be under-inclusive because it would miss activities that states choose to not label as murder but that

---

[8] The Ninth Circuit has elsewhere adopted a definition that is similar in substance based on the Third Circuit's review of state laws, dictionaries and the MPC. *See United States v. Vederoff*, 914 F.3d 1238, 1246 (9th Cir. 2019). There, the definition was "causing the death of another person either intentionally, during the commission of a dangerous felony, or through conduct evincing reckless and depraved indifference to serious dangers posed to human life." *Id.* (internal quotation marks and citation omitted). As the court explained in *Begay II*, federal law's form of murder covers essentially this same set of *mens rea* characteristics. *See Begay II*, 33 F.4th at 1091.

[9] Another reason to use the definition in this case is that, as noted, both parties previously rested arguments on it and I ruled on a motion to dismiss on that basis. *See* Dkt. No. 850.

United States District Court
Northern District of California

1    are generically murder.  The Supreme Court has held that this latter problem is part of the reason

2    for adopting the type of approach I do here.  *See Nardello*, 393 U.S. at 293–94 ("Congress' intent

3    was to aid local law enforcement officials, not to eradicate only those extortionate activities which

4    any given State denominated extortion.").

5         The more colorable other option is that Congress intended courts to apply the categorical

6    approach.  Indeed, this is the position that the government initially took in at least one prosecution,

7    before revising its views on appeal.  *See Keene*, 955 F.3d at 394.  But, as other courts have

8    explained, there is nothing in the statute's text or purpose that calls for application of the

9    categorical approach.  The VICAR murder statute is unlike statutes to which the categorical

10   approach is taken.  There is no textual indication that the elements of the state offense are to be

11   compared to the generic offense.  More fundamentally, the categorical inquiry is not a fit for the

12   sort of inquiry the VICAR statute requires and does not serve the purpose for which it was

13   enacted.  Usually, the categorical approach is reserved for determining whether a *conviction*

14   qualifies for enhanced treatment.  *See, e.g.*, *Descamps v. United States*, 570 U.S. 254, 257 (2013)

15   (discussing the categorical approach's application to convictions).  But the VICAR statute does

16   not ask about past convictions, it asks whether an offense is *chargeable* under the relevant law—a

17   question that turns not on whether the federal and state crimes are a categorical match, but whether

18   the defendant's behavior can fit within both of them.

19        And there is another reason too: the problems that the categorical approach sought to

20   ameliorate do not exist for the VICAR statute.  The Supreme Court has explained that the

21   categorical approach helps avoid potential Sixth Amendment concerns because, otherwise, judges

22   would be enhancing sentences based on their own assessments of past convictions, not based on a

23   categorical assessment.  *See, e.g.*, *id.* at 269.  Because the VICAR statute does not depend at all on

24   past convictions, these Sixth Amendment concerns are not present.  The Court's adoption of the

25   categorical approach was also driven by concerns about "the practical difficulties and potential

26   unfairness of" examining past convictions on their facts.  *Taylor*, 495 U.S. at 601.  No such

27   problem exists in the VICAR context.

28        It is true that the categorical approach does not only apply to past convictions.  Indeed,

23

United States District Court
Northern District of California

Section 924(c) is a prime example of the exception to this general trend: the Supreme Court has held that the categorical approach applies to its elements clause despite not concerning past convictions. *See Davis*, 139 S. Ct. at 2328–33. But the categorical approach applies to Section 924(c) for reasons unique to that statute and not present in the VICAR statute. Section 924(c) uses the language "crime of violence," which the Court had already held implies the use of the categorical approach, *see id.* at 2327–28; the VICAR statute does not use that language (in that way).[10] Section 924(c) also uses the term "offense" to mean a generic crime, *see id.* at 2328; the VICAR statute does not speak of "offense[s]" at all, it speaks of individuals engaging in specific acts. And Section 924(c) was modeled after another federal statute that uses "crime of violence" to require the categorical approach, *see id.* at 2331–32; the VICAR statute was not.

In short, the best reading of the VICAR murder statute is that it requires the defendant to "murder[]" (for present purposes, an act falling within the generic meaning) and it requires that this murder be "in violation of the laws of any State or the United States." And when assessing whether the murder is in violation of the relevant law, it requires evaluating whether the defendant's conduct violated the law, not whether the law itself is a categorical match for anything.

### iii.	The VICAR Murder Predicates Are Crimes of Violence

The final puzzle piece is whether, with this understanding of VICAR murder in place, the VICAR murders here qualify as crimes of violence under Section 924(c). For the reasons that follow, I conclude that they do. In brief, because VICAR murders must always fall within the federal generic definition of murder, and that definition qualifies as a crime of violence, VICAR

---

[10] I include the parenthetical "in that way" because the VICAR statute does include the phrase "crime of violence," but it is for a different purpose than in other statutes—and irrelevant to the present dispute. The statute's relevant clause penalizes one who "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, *or threatens to commit a crime of violence* against any individual." 18 U.S.C. § 1959(a) (emphasis added). This list is disjunctive; the present case concerns murder, not the separate predicate of threatening to commit a crime of violence, so there is no need in this opinion to address whether the categorical approach applied to it here. *See Manning*, 2021 WL 4461599, at *1–*2 (so holding). *Cf. Keene*, 955 F.3d at 396–97 ("Because the defendants have not been charged under this language of VICAR involving a 'crime of violence,' we need not, and do not, consider whether the categorical approach would apply in an analysis of that statutory term.").

1   murder qualifies as a crime of violence.[11]

2       As explained above, an act cannot qualify as VICAR murder if it does not, among other

3   things, fall within the definition of generic (or Section 1111(a)) murder.  *See supra* Section C.ii.

4   And as explained, under that definition, murder is "the unlawful killing of a human being with

5   malice aforethought."  28 U.S.C. § 1111(a).  It defines certain specified types of murder—such as

6   those that are premeditated—as murder in the first degree.  *Id.*  "Any other" type of murder is

7   second-degree murder.  *Id.*  There is no dispute between the parties that first-degree murder

8   qualifies as a crime of violence.  And *Begay II* foreclosed Elmore's argument that federal second-

9   degree murder could not qualify as a crime of violence due to its *mens rea.  Begay II*, 33 F.4th at

10  1093.  Accordingly, there is now no dispute that, for purposes of *mens rea*, an offense under the

11  federal murder statute qualifies as a crime of violence.  And because no VICAR murder charge

12  can be sustained without it meeting (among other requirements) this definition of murder, *see*

13  *supra* Section C.ii., it follows that Elmore's VICAR murder charges are necessarily encompassed

14  within the definition of crimes of violence.

15      To get around this, Elmore contends that I must look to California law to determine

16  whether its offense of murder is a categorical match; he proffers several ways he thinks it differs

17  from federal law's definition.  But Elmore misapprehends how to apply the categorical approach

18  here.  The Section 924(c) predicate is the VICAR murders.  The categorical approach requires an

19  analysis of the elements of *those* offenses.  There are, as noted, multiple possible theories under

20  the VICAR statute, but the elements of a VICAR murder offense like the ones here are that: (1)

21  the enterprise exists; (2) the enterprise is engaged in racketeering activity; (3) the defendant

22  committed or participated in the murders; and (4) the defendant acted for the purpose of gaining

23  entrance to or maintaining or increasing position in the enterprise.  *See Vasquez-Velasco*, 15 F.3d

24  at 842.  *Cf. Banks*, 514 F.3d at 964.  As explained at length above, the "murder" under the VICAR

25  _____

26  [11] Based on the lack of contrary argument, I treat the VICAR statute as divisible to the extent that it penalizes murder.  Elmore makes no argument that I must determine whether the entire VICAR

27  statute constitutes a crime of violence.  And courts have routinely held that each enumerated VICAR offense as divisible when assessing whether it is a valid predicate.  *See, e.g.*, *Manners v.*

28  *United States*, 947 F.3d 377, 380 (6th Cir. 2020); *Sorto v. United States*, No. CR 08-167-4 (RJL), 2022 WL 558193, at *3 (D.D.C. Feb. 24, 2022).

United States District Court
Northern District of California

1    statute needs to be (1) generic (or federal) murder and (2) in violation of the laws of any State or

2    the United States.

3          So understood, the VICAR murder charges in this case qualify as crimes of violence after

4    *Davis*, *Borden*, and *Begay II*.  To qualify as VICAR murder, no matter what the state predicate

5    offense is, the defendant's acts must also always meet the generic federal definition of murder.

6    Said another way, "the full range of conduct" that can be charged as VICAR murder "fall[s]

7    within the scope of the" elements clause because one cannot commit VICAR murder without

8    falling within the federal generic definition of murder.  *Pallares-Galan*, 359 F.3d at 1099–100.  Or

9    stated a third way, the "least egregious" conduct prohibited by the VICAR murder statute falls

10   within the elements clause's reach and, so, is a categorical match.  *Baza-Martinez*, 464 F.3d at

11   1014.  And *Begay II* held that both first- and second-degree murder in the federal definition

12   qualify as crimes of violence even after *Davis* and *Borden.  Begay II*, 33 F.4th at 1091.  Indeed,

13   Elmore does not dispute that, if the federal definition of murder governs, *Begay II* forecloses his

14   argument.  To the extent that the California-law definition of murder is relevant, it matters to

15   whether Elmore committed (here, via *Pinkerton* liability) VICAR murder.  But it cannot extend

16   VICAR liability beyond the bounds of generic murder even if state law itself criminalizes a

17   broader range of behavior.  To sum up, because the generic or federal definition of murder sets the

18   outer bounds of VICAR murder liability, and that definition is a crime of violence under *Begay II*,

19   VICAR murder is a categorical match for a crime of violence.

20         Other cases examining this precise issue against specific challenge—how to employ the

21   categorical approach under Section 924(c) to a predicate violation of the VICAR statute—have

22   reached the same conclusion I do, holding that "the [state] state violations are not the crimes that

23   require proof of crimes of violence.  Instead, the predicate offense is merely § 1959(a)[] alone."

24   *Thomas v. United States*, No. 2:11-CR-58, 2021 WL 3493493, at *6 (E.D. Va. Aug. 9, 2021).

25   Other courts have come close, treating the VICAR statute itself as the predicate offense for

26   Section 924(c) purposes, even if not in the face of argument to the contrary.  *See, e.g.*, *Manners v.*

27   *United States*, 947 F.3d 377, 380 (6th Cir. 2020); *Sorto v. United States*, No. CR 08-167-4 (RJL),

28   2022 WL 558193, at *3 (D.D.C. Feb. 24, 2022); *Cousins v. United States*, 198 F. Supp. 3d 621,

626 (E.D. Va. 2016).  Numerous courts have held that VICAR murder defined as generic or federal-law murder constitutes a crime of violence.  *See, e.g.*, *Moz-Aguilar v. United States*, No. CV 21-9633 (SRC), 2022 WL 73514, at *3 (D.N.J. Jan. 7, 2022); *Reyes v. United States*, No. 2:11CR77-PPS, 2020 WL 4194147, at *3 (N.D. Ind. July 21, 2020).  And, though I do not treat it as binding precedent (it is unpublished), I note that the Ninth Circuit in this case rejected other defendants' arguments about Count 8 and held that VICAR murder is a crime of violence under Section 924(c) after *Begay II*.  *See* Dkt. No. 2515 at 19.

Admittedly, courts have occasionally analyzed whether a VICAR charge could be a predicate for a crime of violence by examining the state-law elements and determining whether they were a categorical match for the federal crime.  *See, e.g.*, *United States v. Mathis*, 932 F.3d 242, 264 (4th Cir. 2019); *Umana v. United States*, 229 F. Supp. 3d 388, 395 (W.D.N.C. 2017).  But they have not, as far as I have found, *held* that this is the correct approach or given a *reasoned explanation* for taking it.  It appears, instead, that they did so on the implicit assumption that it was the correct way to proceed.  It is possible that that is the way the parties framed the inquiry for them or that they assumed for the sake of that opinion that it was proper.  In fact, looking at the elements of state law may sometimes be appropriate because they too set boundaries on what can be charged as VICAR murder.  Either way, I am unaware of any decision holding or suggesting in the face of an argument to the contrary that for a VICAR murder charge to qualify as a crime of violence under Section 924(c), a court must analyze the elements of the VICAR predicate state-law offense *if the generic federal definition meets the crime-of-violence requirement*.  As a result, I take no position on Elmore's argument that California's murder offense does not *itself* qualify as a crime of violence.

For these reasons, the VICAR murders here qualify as crimes of violence even after *Davis*, *Borden*, and *Begay II*.  They were, consequently, proper Section 924(c) predicates.  And because that is so, the Section 924(j) conviction was lawful.

United States District Court
Northern District of California

United States District Court
Northern District of California

## CONCLUSION

The motion to vacate Elmore's conviction is DENIED.  The government's motion for discovery is DENIED AS MOOT.

**IT IS SO ORDERED.**

Dated: August 27, 2022



William H. Orrick
United States District Judge